# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### BOWLING GREEN DIVISION

**CIVIL ACTION NO. 1:07-CV-207-M**

**RODNEY GRAVES**                                                                 **PLAINTIFF**

**V.**

**AMBER BOWLES; ELIZABETH CAPPS;
U.S. BANK, N.A.; OFFICER JASON RICHARDSON,
in his individual and official capacity;
CAPTAIN JAMES DUFF, in his individual and official
capacity; CAPTAIN DAVID GRAVES, in his individual
and official capacity; SGT. JASON MORGAN,
in his individual and official capacity;
OFFICER JIMMY PEDIGO, in his individual
and official capacity; DETECTIVE EDDIE LINDSEY,
in his individual and official capacity,
CITY OF GLASGOW, KENTUCKY;
TPR. THOMAS PYZIK, in his individual capacity;
TPR. WILLIAM SHUFFETT, II, in his individual capacity;
TPR. MICHAEL McILRATH, in his individual capacity;
TPR. DEWAN KELLY, in his individual capacity;
TPR. JOHN NOKES, in his individual capacity;
TPR. JEREMY SLINKER, in his individual capacity;
TPR. NORMAN PRESTON, in his individual capacity;
TPR. CHAD PEERCY, in his individual capacity;
TPR. BRUCE BUTTON, in his individual capacity;
TPR. CHAD CARROLL, in his individual capacity; AND
TPR. ANTHONY FANNIN, in his individual capacity**                 **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on a motion by Defendants Amber Bowles, Elizabeth

Capps, and U.S. Bank (the "Bank Defendants") for summary judgment on Plaintiff's claims

of defamation, negligence, false arrest and imprisonment, and intentional infliction of

emotional distress [DN 29]; on a motion by Defendants Jason Richardson, James Duff, David

Graves, Eddie Lindsey, Jason Morgan, Jimmy Pedigo, and City of Glasgow (the "Glasgow Defendants") for summary judgment on Plaintiff's individual and official capacity claims of excessive force and failure to properly train or supervise under 42 U.S.C. § 1983 [DN 48]; and on a motion by Defendants Thomas Pyzik, William Shuffett, Michael McIlrath, Dewan Kelly, John Nokes, Jeremy Slinker, Norman Preston, Chad Peercy, Bruce Button, Chad Carroll, and Anthony Fannin (the "Kentucky State Police Defendants") for summary judgment on Plaintiff's individual capacity claims for use of excessive force. [DN 47]. Fully briefed, the matter is ripe for decision. For the reasons that follow, Defendants' motions are **GRANTED**.

## I. BACKGROUND

On August 10, 2007, the Glasgow, Kentucky branch of U.S. Bank was robbed at gunpoint. Defendant Elizabeth Capps was working at her desk in the lobby of the bank; Defendant Amber Bowles was working as a teller. The robber, a white male wearing a baseball cap, entered the bank and approached Ms. Bowles's teller window. He pointed a gun at her and held up a white index card demanding several thousand dollars. After Ms. Bowles handed over the contents of her cash register drawer, the robber took the money and left the bank. Both women subsequently gave statements to Detective Lindsey of the Glasgow Police Department. Ms. Bowles gave a statement describing the robber as a "heavy set man 250-275 lbs. about 5'6" or so . . . .[with] curly hair that curled up over his hat." (Defendants' Exhibit #1). Ms. Capps described the robber as "about 5'6 to 5'8 and very heavy set with a pot-belly. He ha[d] on a burgundy shirt, jeans and a cap . . . he had a goatee

and was not clean-shaven." (Defendants' Exhibit #2).

The Glasgow Police Department ("GPD") obtained a photograph of the robber from the bank's surveillance camera. Captain Graves, a distant relative of Plaintiff Rodney Graves, saw the photograph sitting on the squad room table and asked why the police had a picture of his "cousin." After Captain James Duff explained to Captain Graves that the picture was of the person who robbed the U.S. Bank in Glasgow, the two men requested permission from Police Chief Gary Bewley to go to Tompkinsville and investigate and locate Rodney Graves. Captain Graves was not the only person to make the connection between the bank robbery and Rodney Graves. At least one member of the public contacted the Glasgow Police Department identifying Plaintiff as the robber based on media publication of the surveillance photographs. An employee of the Pizza Hut in Glasgow told the GPD that Plaintiff, who she identified by looking at the bank robbery photographs, ate in her restaurant on the day of the robbery. And Plaintiff's former landlord, Stacey Brown, also positively identified the Plaintiff as the person pictured in the bank robbery photographs.[1]

As part of the Glasgow investigation, Rodney Graves was contacted by Tompkinsville Police Chief Dale Ford, who instructed Plaintiff to call Captain Graves regarding the bank robbery. Plaintiff called and spoke briefly to Captain Graves, but was soon transferred to Detective Lindsey, who informed Plaintiff that he was indentified as a suspect in the bank

---

[1] Even officers from the Tompkinsville Police Department, who were familiar with the Plaintiff, and who ultimately believed that the surveillance photograph was not of the Plaintiff, told the GDP that there was a definite resemblence between Rodney Graves and the bank robber.

robbery and that they wanted to meet with him. Plaintiff denied having any involvement with the bank robbery. He cursed Detective Lindsey and the GPD. Then he hung up the phone. A few minutes later, he called back. Plaintiff was told by Captain Graves that he needed to come to Glasgow to discuss the bank robbery. Plaintiff cursed again and hung up the phone. On August 11, 2007, however, he met with the Glasgow police; and he decided to "aggravate" Captain Graves "as a joke" by wearing what the robber reportedly wore: a camouflage cap, a specific type of shirt, and a pair of tennis shoes. (Graves depo., p. 118).

On August 15, 2007, Detective Lindsey individually met with Ms. Bowles and Ms. Capps to show them a photographic lineup of six individuals. Rodney Graves was pictured in photograph #1. The detective instructed each woman to circle the photograph of the individual she thought resembled the bank robber, or who she thought was the bank robber, and asked her to write a statement explaining why she chose to circle that individual. Ms. Capps drew a box around photograph #1. She explained that she "picked [that individual out of the lineup] . . . based on the face shape, facial hair similarities and the fact there was no doubt in my mind it was him." (DN 29, Exhibit 4). Ms. Bowles also circled photograph #1. She picked that photograph because of the individual's "face shape and eyes," saying "[h]e is the guy who came in Friday and robbed the bank." (DN 29, Exhibit 6). While both women admitted that there were physical differences between the individual in the photograph and the robber, such as length of hair, they were both certain that they had identified the robber. (DN 29, Exhibit 5).

That same day, the GPD contacted the Kentucky State Police Special Response Team

("KSP SRT") for help in serving an arrest warrant on Rodney Graves. The KSP SRT consists of a small group of specially trained and equipped Troopers who respond to barricade and hostage situations, and who are further used to serve search and arrest warrants under circumstances where the potential risk for violence or injury is perceived to be beyond the normal inherent risks associated with such law enforcement activities. The SRT was informed that the warrant was to be served on an armed bank robbery suspect who had been positively identified by Captain Graves. They were also informed that the Plaintiff allegedly pulled a firearm during a recent domestic type disturbance; made statements that he would not come in voluntarily; had been belligerent in earlier conversations with GPD; had been involved in prior assaults; and had been known to use drugs, and if intoxicated could be unpredictable.

The KSP SRT located Graves at his residence. After observing a woman and some children at that location, the SRT decided to have Captain Graves call the Plaintiff and invite him to meet in the parking lot of an abandoned gas station. When Rodney Graves arrived at that location, two state police vehicles being driven by members of the KSP SRT simultaneously pulled in front of and behind his vehicle. SRT member Michael McIlrath deployed a flash-bang device out of the window of the latter vehicle, which inadvertently struck and shattered the rear window of Graves's car. At that point, four SRT members – Shuffett, Nokes, McIlrath, and Kelly – took positions at the front and rear driver and passenger side windows of Graves's vehicle. Graves was directed to cover his face with his hands. Shuffett observed Plaintiff reach towards the console of the vehicle and elected to

break the front driver's window to give Graves commands; Nokes broke the rear passenger window of Graves's vehicle at the same time. Graves was removed from his vehicle, handcuffed, and taken into custody without suffering any injury.

Plaintiff's arrest and detention as the Glasgow U.S. Bank robber was short-lived. On August 16, 2007, a bank in Paducah, Kentucky, was robbed, and it soon became clear to law enforcement officials that Rodney Prewitt of Charleston, Indiana, was the Glasgow U.S. Bank robber. Rodney Graves, it turned out, was innocent. He was promptly released and the charges against him were dropped. Subsequently, he brought suit under 42 U.S.C. § 1983 against the Glasgow officers in their individual and official capacities and the KSP officers in their individual capacities for use of excessive force in violation of his Fourth Amendment rights. He also brought suit against Amber Bowles and Elizabeth Capps (and their employer U.S. Bank) for defamation, negligence, false arrest and imprisonment, and intentional infliction of emotional distress based on their lineup identifications of Graves as the bank robber. And he is seeking damages against all Defendants under a "stigma plus" procedural due process theory. Defendants move for summary judgment.

## II. STANDARD

To grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a

6

genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Co.</u>, 475 U.S. 574, 586 (1986). The rule requires the non-moving party to present "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." <u>Anderson</u>, 477 U.S. at 252.

### III. DISCUSSION

Before the Court are three motions for summary judgment. The first, by the Bank Defendants, seeks summary judgment on Plaintiff's claims of defamation, negligence, false arrest and imprisonment, and intentional infliction of emotional distress, arguing that the underlying conduct is protected by a qualified privilege. The second, by the Glasgow Defendants, seeks summary judgment on Plaintiff's individual and official capacity claims of excessive force and failure to properly train or supervise, arguing that they were not present for Plaintiff's arrest, that they are protected by qualified immunity, and that there is no evidence of a failure in training or supervision that lead to a violation of Plaintiff's

constitutional rights. The third, by the Kentucky State Police Defendants, seeks summary judgment on Plaintiff's individual capacity claims for use of excessive force on grounds of qualified immunity. The Court considers these arguments in turn.

A. The Bank Defendants

Amber Bowles and Elizabeth Capps contend that they are entitled to summary judgment because all they did was get robbed at gunpoint while working at U.S. Bank, get shown a lineup by the police, and pick Plaintiff out of that lineup. This conduct, they say, is protected by qualified privileged because "[a] statement, confidentially and in good faith made by one whose property has been stolen, of, or concerning, one whom he suspects of being the offender, in an effort to get advice and assistance of certain officers or another interested in the discovery of the perpetrator of the crime, is privileged." Rutherford v. Church, 49 S.W.2d 326 (Ky. Ct. App. 1932). Plaintiff counters that summary judgment is improper because he is stating a claim of libel or slander per se, which includes "a conclusive presumption of both malice and damage." (Response, p. 13) (quoting Stringer v. Wal-Mart Stores, Inc., 151 S.W.3d 781, 794 (Ky. 2004)); see also CMI, Inc. v. Intoximeters, Inc., 918 F.Supp. 1068, 1083 (W.D. Ky. 1995) (defining slander per se). The Court substantially agrees with Defendants.

Plaintiff's argument is based on cases dealing with Kentucky's "common interest" privilege. The rule evolving out of those cases is that the existence of the privilege rebuts the presumption of malice attached to statements constituting slander or libel per se. Stringer v. Wal-Mart Stores, Inc., 151 S.W.3d 781, 797 (Ky. 2004) (explaining that a qualified

privilege "removes the conclusive presumption of malice otherwise attaching to words that are actionable per se"). However, because a showing of "malice" is an exception to the privilege, see Columbia Sussex Corp., Inc. v. Hay, 627 S.W.2d 270, 275 (Ky. Ct. App. 1981) (citing Baker v. Clark, 218 S.W. 280 (Ky. 1920)), and because the "offensive character" of the per se actionable words is almost invariably "sufficient by itself to support an inference of malice," Tucker v. Kilgore, 388 S.W.2d 112, 114 (Ky. 1965), Kentucky courts regularly find that the effect of the privilege is merely to allow the question of malice to be put to the jury. Stringer, 151 S.W.3d at 797.

That analysis, however, does not apply here. This case involves the provision of information to police by witnesses of a crime, and, therefore, falls under the "public interest" privilege articulated by Grimes v. Coyle, 45 Ky. (6th B. Monroe) 301 (1845).[2] See Dossett v. New York Mining and Manufacturing Co., 451 S.W.2d 843, 846 (Ky. 1970) ("We continue to adhere to the principles of non-liability announced in Grimes v. Coyle."). In Grimes, the plaintiff brought an action in slander against a store owner who identified the plaintiff as the person likely to have burglarized his store. The jury found in favor of the plaintiff and awarded him damages. On appeal, the Kentucky Supreme Court reversed. It concluded that the judgment could not be upheld because there was "no contrariety in the evidence, and not a particle of proof indicating ill will or malice, covert or express, against

---

[2] This privilege exists because "[i]f every person was required to close his lips when a desperate robbery was committed, and make no communication to his honest and vigilant neighbors, of the facts and circumstances of which he might be possessed, pointing in a greater or less degree to a suspected individual, offenses, in many instances, would go unpunished, and offenders escape with impunity." Grimes v. Coyle, 45 Ky. (6th B. Monroe) 301 (1845).

Coyle." Id. If, as Plaintiff contends, the mere statement of criminal suspicion itself were enough to show malice, as appears to be the rule in the Stringer line of cases, the Kentucky Supreme Court would have had to uphold the judgment.

Also on point is Wright v. Jefferson County Police Dept., 14 F.3d 603 (6th Cir. 1993). In that case, the plaintiff sued SuperAmerica Group, Inc. and one of its gas station employees for defamation based upon the employee's statements to police describing the plaintiff and identifying his vehicle as one that had been involved in a robbery. The district court granted summary judgment dismissing all claims against SuperAmerica and the employee on the ground that the statements to police were subject to a qualified privilege. The Sixth Circuit affirmed. It explained that under Kentucky law defendants were protected by the qualified privilege because there was "absolutely no evidence that the employees reported the theft to the police and incriminated the plaintiff because of ill will, hatred or wrongful motive" – in other words, malice. Id. at **4 (citing Holdaway Drugs, Inc. v. Braden, 582 S.W.2d 646, 649-50 (Ky.1979)).

The Court finds this case indistinguishable from Wright. Here, it is undisputed that Defendants believed their statements identifying Rodney Graves to be true; that neither Ms. Capps nor Ms. Bowles knew Graves or had even heard of him prior to circling his photograph on the police lineup; and that Ms. Capps's and Ms. Bowles's statements and identifications of Graves were done without collaboration. (Elizabeth Capps depo., pp. 20, 25-26, 69; Amber Bowles depo., pp. 23-24, 60, 73; Graves depo., p. 39). On top of this, there were and are obvious physical similarities between the photograph of Rodney Graves

and the actual bank robber, Rodney Prewitt, such that mere misidentification alone could not plausibly support an inference of malice—indeed, even Rodney's former landlord and his "cousin" thought he was pictured in the surveillance photos.   In short, there is no evidence in the record that would support a reasonable inference of malice on the part of Elizabeth Capps and Amber Bowles in identifying Plaintiff as the robber of U.S. Bank.

Plaintiff's argument that the qualified privilege was abused or exceeded is unconvincing.  It is true that the privilege may be lost if it is not "exercised in a reasonable manner and for proper purpose." Tucker v. Kilgore, 388 S.W.2d 112, 115 (Ky. 1964) (citing Prosser and Keeton on Torts at 625 (2d ed. 1955)).  However, the only evidence Plaintiff cites in support of this argument is that "[b]oth bank tellers placed in their written statements to the police that they were absolutely certain that they had properly identified the bank robber within the photographs shown to them in the photo lineup; yet, they testified in their depositions that there were clearly substantial differences that they failed to include or otherwise note in their written statements." (Response, pp. 13-14).  This is not enough. Simply because Defendants recognized differences between the photograph they selected from the lineup and their memory of the robber does not support a reasonable inference that they abused their qualified privilege, especially when the alleged "substantial differences" were easily mutable, e.g., hair length, and the identification of Graves was based on more permanent features such as the robber's face shape.[3]

---

[3] Moreover, the idea behind Plaintiff's argument—that the Defendants intentionally or recklessly misled law enforcement by not including such differences on the written form—has

Plaintiff's other claims against Ms. Capps, Ms. Bowles, and U.S. Bank fail for related reasons. Absent any evidence of recklessness or improper intent by these Defendants in misidentifying Plaintiff as the robber, Plaintiff's claims of false arrest or imprisonment and intentional inflication of emotional distress cannot stand. See generally 1 Restatement Torts, 2d, § 45A, Comment c, p. 70 (explaining that for claims of false imprisonment "[i]t is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them."); Childers v. Geile, --- S.W.3d ----, 2009 WL 3672891 (Ky. Ct. App. 2009) (describing the high threshold for the tort of outrage and also explaining that it is only available as a "gap filler"). As for Plaintiff's negligence claim, suffice it to say that any duty Defendants had to Plaintiff was merely to act without malice in identifying him as the robber, since to hold otherwise would vitiate Kentucky's public interest privilege. Cf. McGuire v. Derby Sav. Bank, 1997 WL 772916, *3 (Conn. Super. Ct. 1997). Because there is no evidence upon which a jury could reasonably find that Defendants acted with malice, the Court will grant the Bank Defendants' motion.

B. Law Enforcement Defendants

Plaintiff has also brought claims under 42 U.S.C. § 1983 against members of the

---

no evidentiary support whatsoever. The record shows that Defendants were not instructed to write the information on the form; the form did not include a space for the information; and Defendants otherwise communicated the differences to the police.

Glasgow Police Department and Kentucky State Police for violation of his constitutional rights. To state a claim under § 1983, a plaintiff must establish "both that 1)[ ]he was deprived of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001) (citation omitted). Because "[s]ection 1983 is not itself a source of any substantive rights, but instead provides the means by which rights conferred elsewhere may be enforced[,]" the Court's "first task . . . is to identify the specific constitutional . . . rights allegedly infringed." Meals v. City of Memphis, 493 F.3d 720, 727-28 (6th Cir. 2007) (citations omitted). In this case, Plaintiff contends that his Fourth Amendment right against unreasonable seizure was violated by the Defendants' use of excessive force.[4] See generally Brower v. County of Inyo, 489 U.S. 593, 596-97 (1989).

A claim that the government used excessive force during the course of an arrest is exclusively analyzed under the Fourth Amendment's "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 388, 395 (1989). In Graham, the Supreme Court explained that application of this test "requires careful attention to the facts and circumstances of each

---

[4] Plaintiff ably highlights the numerous shortcomings of the Glasgow police investigation. However, he has failed to link that discussion to any constitutional violation other than his claim that there was an unreasonable seizure under the Fourth Amendment because of the use of excessive force; and the Sixth Circuit has expressly rejected "the argument that the manner in which the detectives obtained and executed the search warrant (i.e., defendants' conduct leading up to but prior to the actual confrontation with [the seized individual]) [is] relevant in assessing the objective reasonableness of their use of force . . . . [b]ecause it is the reasonableness of the 'seizure' that is the issue, not the reasonableness of the detectives' conduct in time segments leading up to the seizure." Chappell v. City Of Cleveland, 585 F.3d 901, 909 (6th Cir. 2009).

particular case, including the [1] severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. The "reasonableness" of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," id., and "in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation," id. at 397. A court is not to substitute its own notion of the "proper police procedure for the instantaneous decision of the officer at the scene." Boyd v. Baeppler, 215 F.3d 594, 602 (6th Cir. 2000).

Defendants argue that, as individuals, they are entitled to qualified immunity. To show otherwise, Plaintiff must prove that a constitutional right was violated and that the right was clearly established at the time of the violation, i.e., that a reasonable officer confronted with the same situation would have known that using the particular force would violate the Plaintiff's right. Scott v. Harris, 550 U.S. 372, 377 (2007); Brosseau v. Haugen, 543 U.S. 194, 199-200 (2004); Harrison v. Ash, 539 F.3d 510, 517 (6th Cir. 2008). "If plaintiff fails to show either that a constitutional right was violated or that the right was clearly established, [h]e will have failed to carry h[is] burden." Chappell v. City Of Cleveland, 585 F.3d 901, 907 (6th Cir. 2009); see also Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The Court concludes that Plaintiff has failed to establish a violation of his Fourth Amendment right to be free from excessive force here.

The material facts of this case are not disputed; what is disputed is whether those facts

support a claim of excessive force. Plaintiff argues that because "[e]ach and every time [he] was called upon, he answered . . . [and] [e]ach and every time he was requested to be interviewed, he attended," (Plaintiff's Response, p. 22), that it was unreasonable for the Glasgow police to have used the KSP SRT, and for the KSP Defendants to have arrested him using "SWAT team members wielding AR-15 rifles" and a "flash bang" device, or to have broken the windows out of his car and "forcefully removed [him] from his vehicle and slammed [him] to the pavement." (Plaintiff's Response, p. 23). Defendants counter that their use of force was appropriate because Plaintiff was an armed bank robbery suspect who had been positively identified by Captain Graves; had allegedly brandished a firearm during a recent domestic-type disturbance; had made statements that he would not come in voluntarily; had been belligerent in earlier conversations with the GPD; and had been involved in prior assaults. The Court agrees with the Defendants.

It is true, as Plaintiff says, that he showed up for questioning, answered his phone, and agreed to meet with certain members of the Glasgow police department during the course of the bank robbery investigation. None of this, however, is probative of what Plaintiff would have done if the Glasgow police had actually attempted to arrest him—after all, requests to talk with the police are much less likely to provoke violent reactions than arrests, and Plaintiff "answered" and "attended" the earlier requests of the Glasgow police to talk with belligerence.[5] Add to this Plaintiff's violent criminal history, and his positive identification

_____

[5] Plaintiff also suggests that the force used to arrest him was excessive because the Glasgow police knew they could have called the Thompkinsville police to peacefully effectuate

15

as an armed bank robbery suspect, and the GPD's decision to call the KSP SRT, and the KSP SRT's decision to initially employ a "flash bang" device outside of Plaintiff's vehicle to distract him, are unquestionably reasonable.[6] Cf. Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1190-91 (10th Cir. 2001) (finding that "the force invoked by the decision to deploy [the SWAT team]" was not "excessive under Fourth Amendment standards" where facts viewed most favorably to plaintiff showed, inter alia, that he was "cooperative in his previous dealings with [arresting officers] to the point of being 'polite'" and police had "no reason to believe [that the suspect] . . . would physically resist arrest"); United States v. Dawkins, 83 Fed. Appx. 48, 51 (6th Cir. 2003) (finding for purposes of a motion to suppress that the use of a flash bang device was "objectively reasonable" where officers knew "that the suspect possessed an assault rifle and that he had previously been convicted of a crime of violence.").

The same is true for the breaking of Plaintiff's car windows and his forceful removal

---

his arrest. As support for this proposition, he says that "Captain Graves definitively states that if Dale Ford (the Thompkinsville Police Chief) had simply asked Rodney to come to the police station, that Rodney would have complied." (Plaintiff's Response, p. 12). This argument is unpersuasive for at least three reasons. First, Captain Graves did not make the decision to call the KSP SRT. Second, counsel's question asking Captain Graves if Rodney would have "come to" the station is not the same as asking him if Rodney would have turned himself in. Third, Captain Graves answered the question in the affirmative with the benefit of 20/20 hindsight; he was not asked what he thought or should have thought based on what he knew at the time the decision to call the KSP SRT was made.

[6] The minor and inadvertent damage to Plaintiff's property, i.e., the breaking of the rear window, does not make it otherwise. See, e.g., Pleasant v. Zamieski, 895 F.2d 272, 276-77 (6th Cir. 1990) (demonstrating that the reasonableness of an officer's alleged use of "excessive" force should depend on the reasonableness of his intentional acts not the "accident[ly] tragic" consequences of those acts).

from the vehicle by the KSP Defendants. The officers' uncontradicted testimony is that they broke the windows because Plaintiff was not responding to their commands and because they observed him reaching toward the console where a gun might have been located. Far from contradicting these facts, Plaintiff acknowledges that he refused to comply with law enforcement's commands even after the windows were broken. He says that one officer told him to "cover [his] face or I'm going to kill you," and that he responded by saying, "what are you doing shooting my damn windows out?" (Graves depo., p. 80). When the officer repeated his command, Plaintiff says that he replied "whatever, mother fucker" and "didn't cover [his face] . . . [he] just held [his hands] out in front of [him]." Id. In light of these facts, the Court concludes that the steps taken by the KSP Defendants to effectuate Plaintiff's arrest did not violate his Fourth Amendment right to be free from the use of excessive force. Cf., e.g., Williams v. Ontario County Sheriff's Dept., --- F.Supp.2d ----, 2009 WL 3028877, *9 (W.D.N.Y. 2009) (explaining that "no reasonable police officer would have concluded that . . . [it was] constitutionally unreasonable" to use a "flash bang" device to safely approach a reportedly armed suspect's vehicle and to break out the vehicle's windows and "forcibly extricate" the suspect after observing him "reach into his jacket as if to retrieve a weapon.").

Having found that Plaintiff has not established a constitutional violation, the Court need not address the latter half of the qualified immunity analysis or answer the question of municipal liability based on the alleged failure to train or supervise. Flemister v. City of Detroit, 2009 WL 4906904, *4 (6th Cir. 2009) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)). Accordingly, the Court finds that summary judgment for the

Defendants on all of Plaintiff's claims is warranted.[7]

## IV CONCLUSION

For the foregoing reasons, Defendants' respective motions for summary judgment are

**GRANTED**.  A judgment will be entered consistent with this Opinion.

cc. Counsel of Record

---

[7] Although only the KSP Defendants have argued it, and then only in their Reply, the Court finds that Plaintiff's "stigma plus" claim fails as a matter of law.  The reason is that he has not identified, let alone established, the "plus," i.e., that "the alleged defamatory acts . . . result[ed] in the deprivation of a constitutionally protected right or interest." Jackson v. Heh, 215 F.3d 1326, *3 (6th Cir. 2000) (citing Paul v. Davis, 424 U.S. 693 (1976)); see also Mertik v. Blalock, 983 F.2d 1353, 1362 (6th Cir. 1993) ("Defamatory publications, standing alone, do not rise to the level of a constitutional claim, no matter how serious the harm to reputation"); cf. (Graves depo., pp. 37-39) (explaining that he does not like "being marked as a thief" but plainly acknowledging that he has not lost his job or any other recognized liberty or property interest because of his misidentification as the Glasgow U.S. Bank robber).